IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | CASE NO. 2:17 cr 151 |
| vs. | : | JUDGE Judge Sargus |
| SALIM DAHDAH, M.D. and CINDY DAHDAH, | : | 18 U.S.C. § 2<br>18 U.S.C. § 1035<br>18 U.S.C. § 1347<br>18 U.S.C. § 1349 |
| Defendants. | : | |

**INDICTMENT**

**THE GRAND JURY CHARGES:**

I.   INTRODUCTION

At all relevant times to this Indictment, unless otherwise alleged:

1. Defendant **SALIM DAHDAH** was a licensed cardiologist in the State of Ohio and owner of Ohio Institute of Cardiac Care (hereinafter OICC) located at 1416 West First Street, Springfield, Ohio. According to documents filed with the Ohio Secretary of State, OICC was originally incorporated on July 1, 1986 under the name "Salim O. Dahdah, M.D." The business name was changed to "Salim Dahdah M.D. & Associates" and then to OICC on September 9, 1992.

2. On July 17, 2000, documents were filed with the Ohio Secretary of State allowing OICC to use the name of Advanced Cardiology Associates, Inc. (hereinafter Advanced Cardiology). Advanced Cardiology Associates was located at 9000 North Main Street, Suite 202, Dayton, Ohio.

3. Defendant **CINDY DAHDAH** was the wife of defendant **SALIM DAHDAH** and incorporator of ACCU- BIL Management Inc. (hereinafter "ACCU-BIL"), a privately held

1

billing company established in or around 2001 with a registered address of 3422 Decoy Court, Beavercreek, Ohio 45431. According to Ohio Secretary of State documents, ACCU-BIL was incorporated as a medical and dental billing service. In or around 2001, ACCU-BIL and OICC entered a business arrangement in which ACCU-BIL agreed to provide administrative and support staff to OICC and bill for medical services provided by OICC.

4. OICC was a cardiology practice focused on treating patients who suffered from cardiac related illnesses, including coronary artery disease. Most OICC patients were elderly and of lower socio-economic class.

5. Defendants **SALIM DAHDAH** and **CINDY DAHDAH** also owned a primary care practice that was located in the same building as the OICC cardiology practice.

II. THE VICTIM HEALTH INSURANCE PROGRAMS

6. The information provided in this section describes the victim health benefit programs (See Attachment "A" which is incorporated into this Indictment and serves as the R.Crim. P. 12.4 Disclosure Statement).

<u>The Medicare Program</u>

7. The Medicare Program was enacted by Congress on July 30, 1965, under Title XVIII of the Social Security Act. The Medicare Program was designed to provide medical insurance protection for covered services to any person age 65 or older, and to certain disabled persons. Medicare is a health care benefit program as defined in 18 U.S.C. Section 24(b) and within the meaning of 18 U.S.C. Sections 1347 and 1035.

8. The United States Department of Health and Human Services ("HHS") was, and is an agency of the United States. The Centers for Medicare and Medicaid Services ("CMS")

was the agency of HHS delegated with administering Medicare. Medicare Part A covered inpatient hospital services.

9. CMS administered Medicare Part B through private insurance companies known as "carriers." Medicare Part B helped pay the cost of health care items and physician's services, including office visits, outpatient therapy, medical supplies and medical tests, including cardiac related tests performed at OICC, such as nuclear stress tests and echocardiograms.

10. Medicare benefits were paid on the basis of reasonable charges for covered services furnished by physicians and other suppliers of medical services to aged or disabled enrollees. CMS, through its carriers notified Medicare providers of the regulations and billing criteria through the Medicare manual and monthly newsletters.

## The Ohio Medicaid Program

11. Medicaid, established by Congress in 1965, provided medical insurance coverage for individuals whose incomes are too low to meet the costs of necessary medical services. Approximately 60% of the funding for Ohio's Medicaid program came from the federal government. The Ohio Department of Medicaid (ODM), Columbus, Ohio, managed the Medicaid program, which was managed previously by the Ohio Department of Job and Family Services (ODJFS). ODM received, reviewed, and obtained formal authority to make payment of Medicaid claims submitted to it by providers of health care.

12. Medicaid Managed Care Organizations (MCOs) were health insurance companies that were licensed by the Ohio Department of Insurance and contracted with the Ohio Department of Medicaid to provide coordinated health care to Medicaid recipients. The MCOs worked with hospitals, doctors, and other health care providers to coordinate care and provide the health care services for Medicaid recipients. Paramount, Buckeye, Caresource, and Molina

were some of the MCOs that paid claims for cardiac related services submitted by OICC and ACCU-BIL.

13. The Office of Budget and Management (OBM) would then issue the check or electronic fund transfer (EFT) from 30 East Broad Street, Columbus, Ohio 43215. Each qualified Medicaid patient received a Recipient Identification Number to identify the patient as an authorized recipient of Medicaid benefits.

14. Medicaid was a health care benefit program, as defined in 18 U.S.C. § 24.

## Private Insurers

15. In addition to Medicare and Medicaid private insurance companies also provided health insurance plans, under which medical benefits, items and services, were provided to individuals. These entities included Anthem Blue Cross and Blue Shield (ABCBS). Individuals who received benefits under health insurance plans offered by the private insurer were referred to as "beneficiaries".

16. To receive reimbursement from the private insurers, medical service providers submitted or caused the submission of claims, either electronically or in writing, to the private insurer for payment of services, either directly or through a billing company.

17. The private insurers were health care benefit programs as defined by 18 U.S.C. §24(b).

## Provider Agreements

18. Health care providers entered into contracts with government and private health care insurers in order to submit claims for reimbursement. These contracts were referred to as provider agreements. Government and private insurers required that providers be licensed with the appropriate State Board governing the laws of their specialty.

4

19. OICC was certified as a provider for Medicare, Medicaid and private insurers, including ABCBS. OICC became a certified Medicare provider on or about November 7, 1996, and was issued the group PIN OH9253901, which became retroactively effective on or about October 1, 1996. OICC became a certified Medicaid provider on or about April 1, 1994 and was assigned provider number 0956890.

20. Participating providers, such as OICC agreed to provide services, submit the claims and accept payments as specified in fee schedules, pricing formulas, and terms of the provider agreement/contract from the health insurance company. The government and private insurers base their reimbursement policies on the Centers for Medicare and Medicaid Services ("CMS") Rules.

21. Each qualified government and private insurance patient received a member Identification Number to have identified the patient as an authorized recipient of health benefits. Pursuant to the American Medical Association and the Centers for Medicare and Medicaid Services ("CMS") Rules, and under the provider agreements/contracts, the government and private insurer only paid for services that were actually performed by qualified individuals and medically necessary for the patient's health.

### Submission of Claims

22. Medical providers, such as OICC, who provided services to government and private insurance patients used the Member Identification number assigned to the patient to complete the Health Insurance Claim Forms (CMS Form 1500). The CMS Form 1500 was submitted by the physician to make claims for payments from the health care benefit programs. The provider identified itself by PIN or Tax Identification Number (TIN). The health care benefit programs then issued a check to the provider under the TIN number for the approved services.

Providers could have submitted the CMS Form 1500 to the health care benefit programs in paper format, or by electronic means.

23. Health care claim forms, both paper and electronic, contained certain patient information and treatment billing codes. The treatment billing codes described various medical services in the language the providers themselves use. These codes were known as Physicians Current Procedural Terminology ("CPT") codes, developed and published by the American Medical Association. Government and private insurer programs have established payment schedules based on the CPT code billed by the provider. By designating a certain CPT code on a claim form to health care benefit programs, the medical provider certified to the health care benefit program that a given treatment was actually rendered in compliance with CPT code requirements.

## Reasonable and Necessary Services

24. Medicare, Medicaid and private insurers prohibited payment for items and services that were not "reasonable and necessary" to diagnosis and treat an illness or injury. Medicare claim forms, for example, required the provider who made a claim for services and procedures, including nuclear stress tests, to certify that the services "were medically necessary". Medicaid and private insurers similarly required providers to certify that services and procedures were medically necessary. In the area of cardiac disease diagnosis and treatment, a doctor, and the medical facilities where the doctor performed cardiac procedures, could have submitted claims for reimbursement to health care benefit programs, but they were required by law to accurately report the medical condition underlying the claim, and only claims that were medically necessary were entitled to reimbursement.

6

25. The Centers for Medicare & Medicaid Services (CMS) published Local Coverage Determinations (LCDs) to detail when particular items or services were covered. LCD Procedure Code 78452 provided that nuclear stress test claims would not be reimbursable without patients showing abnormalities on physical examinations, cardiac tests or without showing changes in signs or symptoms. Specifically, LCD Provider Code 78452 provided the following:

> Procedure Code 78452 – Myocardial perfusion imaging, tomographic; multiple studies, at rest and/or stress and/or redistribution and/or rest reinjection. All stress tests must be performed under direct supervision of a physician. **Myocardial perfusion studies performed based on presence of risk factors in the absence of cardiac abnormalities on physical examinations or abnormalities on cardiac testing will be considered screening and denied as not covered by Medicare. Tests performed unrelated to changes in a patient's signs or symptoms or for immediate pre-operative evaluation will be denied as medically unnecessary** (emphasis added).

### III. Cardiovascular Disease, Diagnosis and Treatment

Coronary arterial circulation of blood is fundamental to the functioning of the human heart. The following acronyms are used to describe the arteries that supply blood to the heart: LMCA (left main coronary artery); LCX (left circumflex artery); LAD (left anterior descending artery); and RCA (right coronary artery).

Coronary Artery Disease (CAD)

26. Coronary artery disease (CAD) was the narrowing or blockage of the above described coronary arteries, usually caused by atherosclerosis. Atherosclerosis (or "hardening" or "clogging" of the arteries) was the buildup of cholesterol and fatty deposits (called plaques) on the inner walls of the arteries. These plaques could restrict blood flow to the heart muscle by physically clogging the artery or by causing abnormal artery tone and function. Significant Coronary Artery Disease ("CAD") was defined by the American College of Cardiology

7

Foundation as angiographically as CAD with greater than or equal to 70% diameter stenosis of at least one major epicardial artery segment, or greater than or equal to 50% diameter stenosis of the left main coronary artery.

Ejection Fraction

27. Ejection Fraction (EF) was the measurement of the percentage of blood leaving the heart each time it contracts. During each heartbeat pumping cycle, the heart contracts and relaxes. When the heart contracted, it ejected blood from two pumping chambers (ventricles). When the heart relaxed, the ventricles refilled with blood. The EF referred to the percentage of blood that was pumped out of a filled ventricle with each heartbeat. An EF of between 55% and 70 % was generally considered normal. An EF of below 35% was severely below normal indicating a greater risk of life-threatening irregular heartbeats that cause sudden cardiac arrest.

Nuclear Stress Test

28. A nuclear stress test (hereinafter "NST") measured blood flow to one's heart muscle both at rest and during stress on the heart. It was performed similarly to a routine exercise stress test, but through the use of an injected radionuclide such as thallium or technetium, it provided images that showed areas of low blood flow through the heart and areas of damaged or at risk heart muscle. A NST usually involved taking two sets of images of the heart — one set during an exercise stress test while the patient was exercising on a treadmill or stationary bike, or with medication that stressed the heart, and another set while the patient was at rest. A NST was used to gather information about the blood flow to the heart and how well the heart worked during physical activity and at rest. The principal purpose of a NST is to evaluate for blockage of the heart arteries.

29. A patient could have been given a NST if the physician suspected the patient might have coronary artery disease or another heart problem, or if an exercise stress test alone wasn't enough to pinpoint the cause of symptoms such as chest pain or shortness of breath. A NST might also have been recommended in order to guide medical or interventional treatment if one had already been diagnosed with a heart condition.

Purpose of NST:

30. The purpose of a NST depended on the clinical scenario. This procedure might have been performed for the diagnosis of coronary artery disease, such as a patient who was having chest pain, or for the evaluation of the extent and severity of known coronary artery disease. NST might also have been used in the pre-operative assessment of patients undergoing non-cardiac surgery. In all cases, NST value lied in the ability to assist in planning care and medical decision-making. As such, significantly abnormal NST results should have been acted upon shortly after test performance. Conversely, NSTs should not have been repeated as a routine evaluation, such as when there was no change in a patient's symptoms, especially after a recent normal examination or as a routine assessment within a short period of time after coronary revascularization.

NST Risks:

31. The potential risks of myocardial perfusion imaging (MPI) or nuclear stress tests related to the stress portion of the procedure, the use of ionizing radiation, inappropriate downstream testing or procedures, and unnecessary expense.

Invasive Cardiac Procedures

32. Cardiac catheterization (heart cath) was the insertion of a catheter into a chamber or vessel of the heart. This was done both for diagnostic and interventional purposes. Subsets of

9

this technique were mainly coronary catheterization, involving the catheterization of the coronary arteries, and catheterization of cardiac chambers and assessment of valves of the cardiac system. Cardiac catheterization was a medical procedure used to diagnose and treat some heart conditions. A long, thin, flexible tube called a catheter would have been placed into a blood vessel in an arm, groin (upper thigh), or neck and threaded to the heart. Through the catheter, a physician could have done diagnostic tests and treatments on the heart.

33. An implantable cardioverter-defibrillator (ICD) or automated implantable cardioverter defibrillator (AICD) was a device implantable inside the body, able to perform both cardioversion, defibrillation and pacing of the heart. The device was therefore capable of correcting most life-threatening cardiac arrhythmias. An implantable cardioverter defibrillator (ICD) was a small device that was placed in the chest or abdomen. Doctors used the device to help treat irregular heartbeats called arrhythmias. An implantable cardioverter defibrillator (ICD) had wires with electrodes on the ends that connected to one or more heart's chambers. These wires carried the electrical signals from the heart to a small computer in the ICD. The computer monitored heart rhythm. If the ICD detected an irregular rhythm, it sent a burst of low-energy electrical pulses to reset the heart to beat at a normal rate or give electrical shock to terminate the life threatening rhythm.

34. An AICD was a more sophisticated device than the pacemaker. Unlike the pacemaker, it could have provided a signal when there was a fatal rhythm abnormality detected as pre-specified in the device. At the same time, it could have mimicked the action of pacemakers by regulating the heartbeat if it ever slowed down to unacceptable levels. It could also treat abnormally fast heartbeats. This feature was known as sending defibrillation shocks. In addition, it was an intelligent device capable of recognizing and distinguishing normal sudden

increases of the heart rate that were due to physical exertion like exercise. Pacemakers were usually indicated for patients who had an abnormal SA node (the natural biologic pacemaker that initiates the beating signal of the heart). It is also prescribed to those who were suffering from a heart block (when the electrical signals from the SA node could not reach the lower heart chambers, which lead to a slower heart rate).

35. AICDs were usually intended for those who suffered from graver heart ailments like those who had lived through a heart attack and those who have experienced VT (ventricular tachycardia) and VF (ventricular fibrillation), or if ejection fraction is less than 35% in spite of adequate medications for an adequate time.

36. A cardiac stent was a small mesh tube that was used to treat narrow or weak arteries. Arteries were blood vessels that carried blood to the heart, as well as away from the heart to other parts of the body. A stent was placed in an artery as part of a procedure called percutaneous coronary intervention (PCI), also known as coronary angioplasty. PCI restored blood flow through narrow or blocked arteries. A stent helped support the inner wall of the artery in the months or years after PCI. Physicians also may have placed stents in weak arteries to improve blood flow to help prevent the arteries from bursting. Stents usually were made of metal mesh, but sometimes they were made of fabric. Fabric stents, also called stent grafts, were used in larger arteries. Some stents were coated with medicine that was slowly and continuously released into the artery. These stents were called drug-eluting stents. The medicine helped prevent the artery from becoming blocked again.

## COUNT 1
## Conspiracy to Commit Health Care Fraud
## [18 U.S.C. § 1349]

37. Paragraphs 1 through 36 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

38. From on or about May 2, 2007 and continuing through on or about January 13, 2015, in the Southern District of Ohio, defendants **SALIM DAHDAH** and **CINDY DAHDAH**, did knowingly and willfully combined, conspire, confederate and agree with each other and others, both known and unknown to the Grand Jury, to violate 18 U.S.C §1347 that is to execute a scheme or artifice to defraud health care benefit programs, or obtain by means of false and fraudulent pretenses, representations, or promises, any of the money owned by, or under the control of a health care benefit program, that is Medicare, Ohio Medicaid and private insurers, in connection with the delivery of or payment for health care benefits, items or services.

### Purpose of the Conspiracy

39. It was the purpose of the conspiracy for defendants **SALIM DAHDAH** and **CINDY DAHDAH** to perpetuate a health care fraud scheme to unlawfully enrich themselves by billing or causing bills to submitted for medically unnecessary medical tests and procedures, including nuclear stress test and invasive cardiac procedures, such as stenting and ICD/AICD surgeries, that exposed OICC patients to the risk of serious physical harm.

### Manner and Means

40. It was part of the conspiracy that defendants **SALIM DAHDAH** and **CINDY DAHDAH**, or others at their direction, created aggressive medical protocols for cardiac related tests and procedures, including, but not limited to, NSTs (thallium), echocardiograms, bone density exams (osterograms), chest x-rays, and renal scans that defendants SALIM DAHDAH

12

and CINDY DAHDAH required OICC and ACCU-BIL staff to follow regardless of the medical necessity of the procedures.

41. It was further part of the conspiracy that the OICC protocols required annual NSTs for OICC patients who were either diabetic or had CAD, regardless of whether it was ordered by the treating physician, or was medically necessary based on the patients symptoms, physical examination or prior test results.

42. It was further part of the conspiracy that pursuant to OICC protocols, defendants **SALIM DAHDAH** and **CINDY DAHDAH**, would require ACCU-BIL and OICC to schedule nuclear stress tests several weeks or months prior to the test being performed.

43. It was part of the conspiracy that defendants **SALIM DAHDAH** and **CINDY DAHDAH** would require non-medical staff to schedule test and procedures, including nuclear stress tests, without the knowledge or consent of the treating physicians.

44. It was further part of the conspiracy that defendants **SALIM DAHDAH** and **CINDY DAHDAH** would require OICC and ACCU-BIL staff to designate on medical claim forms, the physician who had most recently treated the patient as the referring/ordering physician of the NST, notwithstanding that the NST was never ordered by the treating physician and was medically unnecessary. For example, on or around November 22, 2011, patient T.B. received a NST pursuant to OICC testing protocol. The claim submitted to the health care benefit program indicated that Dr. R.K. was the referring/ordering physician; however, Dr. R.K., who was the last physician to treat patient T.B., never ordered the NST.

45. It was further part of the scheme that in order to ensure that OICC testing protocols would be strictly followed, defendant **CINDY DAHDAH** would reprimand, humiliate or threaten to terminate employees who refused to schedule medical tests according to OICC

protocols. This was frequently demonstrated during staff meetings when defendant **CINDY DAHDAH** would single-out and demean ACCU-BIL and OICC employees who failed to comply with testing protocols. Defendant **CINDY DAHDAH** would also send intimidating emails to pressure staff to schedule tests according to protocols regardless of whether the test was ordered by a treating physician or medically necessary.

46. Defendants **CINDY DAHDAH** and **SALIM DAHDAH** would also pressure OICC and ACCU-BIL staff to increase testing productivity by requiring them to search diagnosis reports and look for patients who would qualify for medical testing pursuant to OICC protocols.

47. It was further part of the conspiracy that defendant **CINDY DAHDAH**, or employees at her direction, would also terminate or threaten to terminate OICC primary care patients who refused to be treated by a cardiologist at OICC.

48. It was further part of the conspiracy that OICC created "protocol sheets" to quickly identify those tests and procedures that needed to be ordered for OICC patients. OICC also employed a protocol nurse whose duties included reviewing and updating protocol sheets to ensure that protocols were being followed.

49. It was part of the conspiracy that at the direction of defendants **SALIM DAHDAH** and **CINDY DAHDAH**, ACCU-BIL and OICC staff would schedule protocol tests only for OICC patients who had medical insurance. Self-paying patients who had no medical insurance were not scheduled for and did not receive protocol related tests and procedures.

50. It was part of the conspiracy that in order to increase revenue, defendant **SALIM DAHDAH** intentionally misinterpreted cardiac tests, including heart catheterizations, to justify risky interventional procedures, including the insertion of stents and AICDs when they were medically unnecessary. For example, defendant **SALIM DAHDAH** told patient D.B., who was

14

in his/her thirties, that his/her ejection fraction (EF) dropped to approximately 34% and, therefore, he/she needed an ICD or would die. D.B. was subjected to risky surgery by defendant **SALIM DAHDAH** who implanted an AICD into D.B. on or around December 16, 2013. D.B. then decided to seek the services of another cardiologist, who after reviewing his/her medical records, determined that her EF was significantly greater than 34% and that the AICD was medically unnecessary. D.B. was required to undergo a second risky heart surgery to have the AICD removed.

51. It was part of the conspiracy that defendants **SALIM DAHDAH** and **CINDY DAHDAH** would order, or direct OICC and ACCU-BIL staff to order, NSTs and other cardiac test and procedures that were medically unnecessary.

52. As a result of the health care fraud scheme, SALIM DAHDAH and CINDY DAHDAH submitted, or caused to be submitted over 2000 claims totaling approximately $2 million to Medicare, Ohio Medicaid and private insurers, for medically unnecessary procedures.

**All in violation of 18 U.S.C. §1349.**

15

## COUNT 2
## HEALTH CARE FRAUD
## [18 U.S.C. § 1347]

53. Paragraphs 1 through 36 and 40 through 52 are realleged and incorporated by reference as though fully set forth herein.

54. From on or about May 5, 2007, through January 13, 2015, in the Southern District of Ohio, Defendants **SALIM DAHDAH** and **CINDY DAHDAH**, aided and abetted by others, did knowingly and willfully execute a scheme or artifice to defraud health care benefit programs, or obtain by means of false and fraudulent pretenses, representations, or promises, any of the money owned by, or under the control of a health care benefit program, that is Medicare, Ohio Medicaid and private insurers including Anthem Blue Cross and Blue Shield, in connection with the delivery of or payment for health care benefits, items or services, by billing or causing bills to be submitted for procedures, including nuclear stress tests, catheterizations, stents and AICDs that were medically unnecessary.

**All in violation of 18 U.S.C. § 1347 and § 2.**

## COUNTS 3-7
## Health Care False Statements
## [18 U.S.C. § 1035]

55. Paragraphs 1 through 36 and 40 through 52 are realleged and incorporated by reference as though fully set forth herein.

56. On or about the dates listed below, in the Southern District of Ohio, defendants **SALIM DAHDAH and CINDY DAHDAH**, knowingly, willfully and in connection with the payment for health care benefits, services or items involving a health care benefit program, that is the Medicare and the Medicaid programs, falsified, concealed or covered up by trick or scheme a material fact, that is submitted or caused to be submitted bills to the health care benefit programs for nuclear stress tests that were medically unnecessary, as follows:

| Count | Patient | CPT Code Billed | Date of Service | Amt. Billed | Date Billed | Amt. Paid | Date Paid (Insurer) |
|---|---|---|---|---|---|---|---|
| 3 | J.H. | 78452 (NST) | 7/19/2013 | $1405.00 | 7/22/2013 | $368.87 | 8/02/2013 (Medicare) |
| 4 | M.G. | 78452 (NST) | 9/11/2013 | $1,405.00 | 9/13/2013 | $368.87 | 9/20/2013 (Medicare) |
| 5 | V.D. | 78452 (NST) | 07/01/2014 | $1405.00 | 10/02/2014 | $356.02 | 10/10/2014 (Medicare) |
| 6 | B.T. | 78452 (NST) | 11/20/2012 | $1405.00 | 11/23/2012 | $216.25 | 12/8/2012 (Medicaid-Caresource) |
| 7 | H.A. | 78452 (NST) | 12/31/2013 | $1405.00 | 1/03/2014 | $216.25 | 1/18/2014 (Medicaid-Caresource) |

**All in violation of 18 U.S.C. § 1035 and § 2.**

## COUNTS 8-9
## Health Care False Statement
## [18 USC § 1035]

57. Paragraphs 1 through 36 and 40 through 52 are realleged and incorporated by reference as though fully set forth herein.

58. From on or about December 16, 2013, through on or about March 22, 2014, in the Southern District of Ohio, Defendant **SALIM DAHDAH**, knowingly, willfully and in connection with the payment for health care benefits, services or items involving health care benefit programs, that is the Medicare and Medicaid programs, falsified, concealed or covered up by trick or scheme a material fact, that is submitted or caused to be submitted to the Medicare and Medicaid programs claims for an AICD and stent that were medically unnecessary as follows:

| Count | Patient | CPT Code Billed | Date of Service | Amt. Billed | Date Billed | Amt. Paid | Date Paid |
|---|---|---|---|---|---|---|---|
| 8 | D.L. | 92982 (Stent) | 11/08/2012 | $2,500 | 11/14/2012 | $502.49 | 11/17/2012 (Medicare) |
| 9 | D.B. | 33249 (AICD) | 12/16/2013 | $2,500 | 01/16/2014 | $798.43 | 03/22/2014 (Medicaid-Caresource) |

All in violation of 18 U.S.C. § 1035 and § 2.

A TRUE BILL.

s/Foreperson
FOREPERSON

BENJAMIN C. GLASSMAN
UNITED STATES ATTORNEY

KENNETH F. AFFELDT (0052128)
Assistant United States Attorney

MARITSA A. FLAHERTY (0080903)
Special Assistant United States Attorney

## **VICTIM HEALTH CARE PROGRAMS**

### Fed.R.Crim.P. 12.4 Disclosure Statement

The following are the victim health care programs:

A. <u>The Medicare Program</u>
Centers for Medicare and Medicaid
7500 Security Boulevard
Baltimore, Maryland, 21244

    Medicare is a federal health program providing benefits to persons who are over the age of 65 or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services (CMS), a federal agency under the United States Department of Health and Human Services. CMS is responsible for payments of claims submitted by approved providers for health care benefit, items or services rendered to qualified beneficiaries.

    The United States Department of Health and Human Services ("HHS") is an agency of the United States. The Centers for Medicare and Medicaid Services ("CMS") is the agency of HHS delegated with administering Medicare. Medicare Part A covers inpatient hospital services. CMS administers Medicare Part B through private insurance companies known as "carriers." Medicare Part B helps pay the cost of health care items and physician's services, including office visits, outpatient therapy, medical supplies and medical tests.

B. <u>The Medicaid program</u>

    The Ohio Department of Medicaid
    50 West Town Street, Suite 400
    Columbus, Ohio 43215

    Medicaid, established by Congress in 1965, provides medical insurance coverage for individuals whose incomes are too low to meet the costs of necessary medical services. Approximately 60% of the funding for Ohio's Medicaid program comes from the federal government. The Ohio Department of Medicaid (ODM), Columbus, Ohio, manages the Medicaid program, which was managed previously by the Ohio Department of Job and Family Services (ODJFS). ODM receives, reviews, and obtains formal authority to make payment of Medicaid claims submitted to it by providers of health care benefits, items or services.

    ODM contracts with Medicaid Managed Care Organizations (MCOs) through contracts known as Contractor Risk Agreements (CRAs), which conform to the requirements of 42 U.S.C. §§1395mm and §1396b(m), along with any related federal rules and regulations. MCOs are health insurance companies that provide coordinated health care to Medicaid beneficiaries. The MCOs contract directly with healthcare providers, including hospitals, doctors, and other health care providers to coordinate care and provide the health care services for Medicaid beneficiaries.

Providers who contract with an MCO, are known as Participating Providers. Pursuant to the CRAs, ODM distributes the combined state and federal Medicaid funding to the MCOs, which then pay Participating Providers for treatment of Medicaid beneficiaries.

**Paramount, Buckeye, Caresource, and Molina** re Medicaid MCO's that paid claims for cardiac services, items or benefits to OICC.

### C. Anthem Blue Cross and Blue Shield

120 Monument Circle
Indianapolis, IN, 46204

Anthem, Inc. is one of the largest health benefits companies in the United States. Through its affiliated health plans, Anthem companies provides a number of health benefits through a broad portfolio of integrated health care plans and related services, along with a wide range of specialty products such as life and disability insurance benefits, dental, vision, behavioral health benefit services, as well as long term care insurance and flexible spending accounts.

Headquartered in Indianapolis, Indiana, Anthem, Inc. is an independent licensee of the Blue Cross and Blue Shield Association serving members in California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri, Nevada, New Hampshire, New York, Ohio, Virginia and Wisconsin; and specialty plan members in other states.

The company was formed when WellPoint Health Networks Inc. and Anthem, INC. merged in 2004 to become the nation's leading health benefits company. The parent company originally assumed the WellPoint, Inc. name at the time of the merger. In December 2014, WellPoint, Inc. changed its corporate name to Anthem, Inc.